JUSTICE TRIEWEILER
dissenting in part and specially concurring in part.
I dissent from the majority opinion.
I do not quarrel with the majority’s statement of the law applicable to this case. I do conclude that it is incomplete and that the majority’s interpretation of the record is incorrect.
Section 35-10-603(l)(b), MCA (1987), which was in effect at the time Lloyd and Marsha entered into their agreement, provided as follows:
Dissolution is caused, without violation of the agreement between the partners by:
(b) The express will of any partner when no definite term or particular undertaking is specified ....
In other words, because there was no specified term for this partnership, Marsha could have terminated the partnership agreement at any time.
The majority correctly notes, as we stated in Rudio v. Yellowstone Merchandising (1982), 200 Mont. 537, 543-44, 652 P.2d 1163, 1167, *314 that a promise by Marsha to forebear her right to terminate the partnership would have been sufficient consideration for Lloyd’s agreement to leave his partnership interest to her at the time of his death. However, the majority then concludes that there was no evidence of such a promise in the testimony. I disagree.
Marsha gave the following testimony at trial:
Q. Let me jump ahead a little bit, Marsha, and I’ll get back to some of these exhibits. Did there come a time when you became concerned regarding the amount of monies you were investing in the partnership?
A. Yes.
Q. Okay, and you talked with Mac about this?
A. Yes, briefly.
Q. Okay, what was your concern?
A. Well, my concern was that his family was giving him quite a bit of trouble, and I was not going to put anymore [sic] money into the business, at that time.
Q. Was Mac aware of that?
A. Yes, he was.
Q. And so what happened?
A. Well, to start with, Mac was a little bit concerned about his family and he wanted to protect me, and to start with, I told him, that I didn’t believe — actually I told him his handshake was good enough for me. And his concerns became more and more, and as his concerns became more and more—
Q. Did you — I’m going to speed some of this up. Did you discuss with Mac, regarding what your intent was to do with the business? A. Yes, I was just getting to that now.
Q. And what was your discussion?
A. We were taking down — going down to the horses and I told him that I was not going to put anymore [sic] money into the business, and that there wasn’t going to be a business. I was going to get out if he didn’t do something to protect me, and — some kind of an agreement or something because there was not going to be a business after ’87.
Q. Okay, and did you — was an agreement finally then signed by Lloyd McKay?
A. Yes.
(Tr. 647-48)
*315 Q. Marsha, would you have continued on with your contributions to the partnership, if that agreement had not been signed by Mac?
A. No, I would not.
(Tr. 652)
THE COURT: So the question you’re asking is, up to the time Mr. McKay signed the agreement, had Mrs. Wickman discussed with him the fact that she would not be making anymore [sic] contributions to the partnership unless such an agreement was signed.
MR. SCHWANKE: That’s my question.
A. I — we did have a conversation, yes. We did not have a discussion. To me, a discussion is quite lengthy. The conversation we had was about a 30 second conversation and I told him I was not going to put anymore [sic] money into the partnership unless we had some kind of an agreement that was going to protect me, and otherwise I was done, I was out.
Q. When did you tell him this?
A. It was sometime — oh, just a few weeks, probably, before the initial agreement.
(Tr. 697-98)
(Emphasis added.)
There is only one interpretation that can be attached to the testimony which is quoted. Marsha Wickman was aware of her right to terminate her partnership with Lloyd McKay. She was aware that without some protection of her future interest it was not financially reasonable for her to continue to invest in the partnership; but she agreed to forebear from terminating the partnership based on the agreement that was signed by McKay and which is the subject of the Court’s opinion. There was no evidence to the contrary. I conclude that the above testimony was direct evidence of a promise to forebear on Marsha’s part and did provide sufficient consideration for the agreement entered into between her and Lloyd McKay on August 24,1997.
For these reasons, I dissent from that part of the majority opinion which affirms the District Court’s refusal to enforce the agreement between the parties. I concur with those parts of the majority opinion which relate to promissory and collateral estoppel.
JUSTICE HUNT and JUSTICE REGNIER join in the foregoing dissenting and concurring opinion.